## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STEVE L. McCOY, | ) | CASE NO. 4:09CV3155 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| MICHAEL J. ASTRUE, as | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.*

## PROCEDURAL BACKGROUND

The Plaintiff, Steve L. McCoy, filed his application for disability insurance benefits on October 26, 2004.  (Tr. 87-89.)  His application was denied initially (Tr. 44-47) and on reconsideration.[1]  (Tr. 51-54.)   McCoy requested a review and a hearing before an administrative law judge ("ALJ").  (Tr. 55.)  McCoy appeared with his attorney at a January 17, 2007, hearing before the ALJ.  (Tr. 1267-1308.)  On July 19, 2007, the ALJ issued a written opinion that McCoy was not under a disability within the meaning of the Social Security Act from the amended onset date of February 1, 2003, through the date last insured, March 31, 2006.  (Tr. 15.)  The Appeals Council denied McCoy's request for review.  (Tr. 7-11.)  Therefore, the ALJ's decision constitutes the Commissioner's final

---

[1]This was McCoy's third unsuccessful application for disability benefits.  (Tr. 1269.)

decision subject to judicial review.  McCoy filed this action challenging the Commissioner's final decision.  The Court has carefully considered the record (Filing Nos. 9-12) and the parties' briefs (Filing Nos. 20, 25).

## FACTUAL BACKGROUND

McCoy alleges disability as a result of Post Traumatic Stress Disorder ("PTSD"), "some" Parkinson's disease, Attention Deficit Disorder ("ADD"),[2] and peripheral neuropathy. (Tr. 1269.)  McCoy was born April 25, 1949, and was 53 years old as of his amended alleged onset date and 56 years old on the date last insured.  (Tr. 87.)  He earned a general equivalency diploma, and he has worked as an automatic machine attendant, product tester, and packer.  (Tr. 24.)

### Medical Evidence

On October 28, 2002, four months prior to the amended onset date of disability, McCoy saw his primary care physician, Steven Saathoff, M.D.  (Tr. 221.)  McCoy complained of: worsening hand tremors; trouble sleeping together with intrusive thoughts; depression; and anxiety.  Dr. Saathoff noted McCoy's previous diagnosis of PTSD and lack of treatment for the hand tremors.  McCoy stated the hand tremors worsened when he was at work.  (Tr. 221.)  Upon examination, the doctor noted normal muscle strength and gait, but observed a "[f]ine tremor of the hands [that] worsened with intentional movements." (Tr. 221.)  Dr. Saathoff prescribed Lexapro and Buspar for McCoy's PTSD symptoms.  He refrained from prescribing any medication for McCoy's tremors, noting that he didn't want

---

[2]Little, if any, mention is made of ADD in McCoy's medical records.

2

to start more than one course of treatment at a time and that he would consider Mysoline therapy for the tremors if McCoy tolerated the psychiatric medications.  (Tr. 221.)

On December 5, 2002, McCoy saw Dr. Saathoff for a general medical examination. Dr. Saathoff noted that the hand tremors seemed to be "greatly worsening" and were more "intentional."  However, Dr. Saathoff stated that McCoy had "no other neurologic signs or symptoms, nor any signs or symptoms of the onset of Parkinson's disease."  (Tr. 220.)  Dr. Saathoff prescribed Trazadone for chronic insomnia, and continued the psychiatric medications.  (Tr. 220.)

In February 2003, McCoy completed a consultative disability evaluation with a psychologist, Dr. William R. Stone, Ph.D.  (Tr. 276-82.)  Dr. Stone opined that McCoy's symptoms were congruent with a diagnosis of PTSD and mixed personality disorder with antisocial features.  (Tr. 281.)  Dr. Stone found that McCoy: could generally sustain concentration and attention; was capable of understanding, remembering, and carrying out short and simple instructions under ordinary supervision; could understand and remember complex and complicated instructions and, much of the time could carry out such instructions, noting that difficulty in carrying out these instructions was a result of intrusive thoughts; could relate appropriately to coworkers and supervisors "when he decides to do so"; and was able to adapt to ordinary daily changes in his environment.  Dr. Stone noted that McCoy would have a difficult time in settings requiring contacts with the general public or larger numbers of coworkers and supervisors.  (Tr. 282.)

In April 2003, McCoy saw Dr. Saathoff for a prostate evaluation.  He did not complain of problems relating to his mental health or his hand tremors.  Dr. Saathoff noted McCoy did not appear to be in "acute distress" or "obvious pain."  (Tr. 218.)

3

In July 2003, Dr. Saathoff saw McCoy and stated that Lexapro had helped McCoy's depression and PTSD, in particular with respect to sleeping problems.  McCoy's mood and affect were normal.  (Tr. 217.)

In October 2003, McCoy completed a Daily Activities and Symptoms Report.  (Tr. 135-39.)  He described his daily activities as including gardening, mowing the lawn, watching television, and occasionally visiting family.  (Tr. 135-36.)  He indicated that he could sit for one hour and stand for thirty minutes before experiencing pain in his legs.  (Tr. 136.)  He indicated that he could garden or mow the lawn for an hour, and he gardened three times weekly.  (Tr. 135-36.)   He also indicated that he had experienced some relief from anxiety since taking Buspar and Lexapro, but he still was not sleeping well.  (Tr. 138.)  In November 2003, McCoy's wife completed a Supplemental Information Form in support of his disability application.  (Tr. 140-42.)  She stated that his activities included child care, visiting with friends or family once a week, watching television, going to movies,  gardening, pet care, and home schooling one of their children independently and appropriately albeit with some frustration.  She stated that McCoy responds "fine" to employers and criticism and well to supervision, and he adjusts to changes at home and work.  (Tr. 140-41.)  She noted, however, that McCoy has trouble concentrating, is easily irritated and angered, and has trouble sleeping.  (Tr. 142.)

In November 2003, McCoy saw Dr. Ruilin Wang., M.D., for a consultative disability examination.  (Tr. 295-98.)  McCoy reported that he had suffered from chronic low back pain for more than two years that affected his daily activities.  (Tr. 295.)  He also complained of numbness and tingling in his legs, as well as ankle pain.  (Tr. 295.)  McCoy told Dr. Wang that his activity was limited to "walking less than two or three blocks, standing

4

less than one hour, and sitting less than one hour." (Tr. 295.) He rated his pain as a four on a ten-point scale. (Tr. 295.) He did not mention experiencing hand tremors. Dr. Wang found that McCoy was in "no acute distress" and opined that McCoy "has a chronic lower [back][3] pain with a radiating pain down to both lower extremities and more on the left side" and further stated that he noted no neurologic impairments. Dr. Wang suggested that McCoy follow up with his primary care physician regarding his PTSD and depression. (Tr. 296, 298.)

In 1999, McCoy began seeing Janet Waage Lingren, Ed.D.,[4] for marital counseling. In a report dated December 23, 2003, Dr. Lingren opined that while McCoy is able to function at an acceptable level with his family, his PTSD "has made it impossible for him to function in the world of work." (Tr. 289.) Dr. Lingren began counseling McCoy on an individual basis in January 2004, seeing him once or twice weekly through the date of the expiration of his insured status. (Tr. 285.) The record includes nearly 400 pages of Dr. Lingren's handwritten notes from her therapy/neurofeedback sessions with McCoy. (Tr. 413-785.) The notes contain multiple references to McCoy's reports of physical symptoms such as tremors. On February 10, 2005, Dr. Lingren stated in a report requested in conjunction with McCoy's disability application that McCoy's "ability to do work related activities such as sitting, standing, lifting, carrying, and handling objects has been

---

[3]Dr. Wang's report actually states "chronic lower leg pain," however this appears to be a transcription error or a misstatement as it is inconsistent with his notes. (Tr. 297-98.)

[4]Dr. Lingren's letterhead identifies her as a licensed mental health practitioner and certified professional counselor. (Tr. 287.)

dramatically compromised because of the tremors." (Tr. 286.)  However, Dr. Lingren noted that McCoy home schools his autistic daughter.  (Tr. 285.)

In January 2004, McCoy returned to Dr. Stone for a second consultative evaluation. (Tr. 272-75.)  McCoy informed Dr. Stone that he was seeking disability for PTSD and leg problems, stating that his condition was unchanged since he last saw Dr. Stone.  Dr. Stone noted that McCoy did not display any "remarkable involuntary movements [or] gross peculiarities of posture or gait." (Tr. 272.)  Dr. Stone diagnosed McCoy as having chronic PTSD secondary to his military service in Vietnam.  (Tr. 274.)  He opined that McCoy: continued to be "psychologically capable of performing basic daily living tasks"; was generally capable of sustaining concentration and attention albeit with decreasing brief intrusive thoughts about his military service; could understand and remember short and simple, as well as complex and complicated, instructions; was often capable of carrying out instructions under ordinary supervision; could relate appropriately to coworkers and supervisors; and was able to adapt to ordinary daily changes in his environment.  Dr. Stone stated that McCoy's could be expected, due to his PTSD and personality disorder, to have prohibitive difficulty in jobs requiring ongoing interaction with the general public or ongoing collaborative work with large numbers of coworkers or supervisors.  (Tr. 275.)

In February 2004, a state agency physician, A.R. Hohensee, M.D., concluded that McCoy could, in relevant part: occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; stand about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; engage in unlimited pushing and pulling; occasionally climb, balance, stoop, kneel, crouch and crawl; and reach, handle, finger, or feel on an unlimited basis.  (Tr. 317-19.)  McCoy complained of pain in his legs and prostate problems, and he did not

6

mention tremors or problems related to his PTSD.  He told Dr. Hohensee that he could garden and mow the lawn for an hour each.  Dr. Hohensee noted an inconsistencies between McCoy's statements that he could walk less than two or three blocks and stand or sit for less than an hour while he was able to garden, mow, and go to movies.  (Tr. 321.)

Also in February 2004, McCoy saw an agency psychologist, Linda Schmechel, Ph.D. (Tr. 334-36.)  Dr. Schmechel found no more than moderate limitations, and in most instances no significant limitations, in relevant areas relating to understanding and memory, concentration, social interaction, and adaptation.  (Tr. 334-35.)  Dr. Schmechel concluded that McCoy could perform simple unskilled tasks.  (Tr. 336.)

In April 2004, McCoy saw Dr. Saathoff for intermittent chest pain.  McCoy did not complain of tremors or PTSD symptoms, and Dr. Saathoff's notes reflect no discussion of these issues.  (Tr. 216.)

On July 13, 2004, McCoy saw Dr. Saathoff complaining of the tremors in his hands that he said he reported experiencing for years and that sometimes prevent him from being able to write his name.  Although Dr. Saathoff noted a fine tremor in his hands worsened when McCoy kept his hands still, Dr. Saathoff noted 5/5 muscle strength in upper and lower extremities and normal gait.  (Tr. 215.)  Dr. Saathoff prescribed Mysoline for the tremor.

In September 2004, McCoy returned to Dr. Saathoff.  McCoy stated the Mysoline was not controlling the tremor and made him feel disoriented at night.  Dr. Saathoff diagnosed McCoy with a benign essential tremor, discontinued the Mysoline and prescribed Toprol. (Tr. 215.)

On October 20, 2004, McCoy returned to Dr. Saathoff and reported the tremors worsened with activities such as eating or drinking and were most pronounced in the upper

7

extremities and accompanied by some head nodding.  Dr. Saathoff doubled McCoy's dosage of Toprol.  (Tr. 214.)

In November 2004, Dr. Saathoff referred McCoy to a neurologist, John Puente, M.D., for evaluation of his previously diagnosed benign essential tremor.  (Tr. 308.)  Dr. Puente noted that McCoy had been experiencing tremors for the previous seven or eight years that progressed from the right thumb to include both hands, fairly symmetrically.  (Tr. 308.) McCoy reported to Dr. Puente that the tremors worsened with exertion and affected his "writing, some use of fine dexterity, or even course [sic] movements, such as holding the paper." (Tr. 308.)  Dr. Puente also noted McCoy's history of PTSD and his past heavy use of alcohol. (Tr. 308.)  Dr. Puente's neurological exam showed "very slight increased  tone, slight cogwheel rigidity in the left upper extremity with decrease left arm swing" as well as tremor which was "more noticeable with posture, very slight at resting."  (Tr. 309.)  Dr. Puente did not see an intentional tremor, and found that McCoy's strength and gait to be normal.  (Tr. 309.)  Dr. Puente opined that McCoy's PTSD could cause a hyper-arousal state, which could cause tremor; however, he also noted that McCoy might have a component of an essential tremor.  (Tr. 309.)  Dr. Puente further opined that McCoy's tremor "is most likely . . . a combination." (Tr. 309.)  He discontinued the Toprol, prescribed a gradually increasing dosage of the medication, Requip, and scheduled a followup appointment.  (Tr. 309.)

McCoy saw Dr. Puente for a followup visit on December 6, 2004.  (Tr 307.)  In his notes from the appointment, Dr. Puente states that his previous observation of cogwheel rigidity "was consistent enough with possible Parkinson's or Parkinsonian syndrome to try Requip."  (Tr. 307.)   He noted that McCoy was showing a positive response to the

8

medication, but that there was "some residual tremor overall." (Tr. 307.)  Upon examination, Dr. Puente noted "some mild decrement to amplitude and speed, particularly in his right upper extremity," as well as a mild resting tremor in the bilateral upper extremities.  (Tr. 307.) In addition, he noted some very mild facial features, consistent with Parkinson's disease. (Tr. 307.)  Dr. Puente opined that McCoy's condition was "likely Parkinson's disease," and that a hyper-arousal state caused by stress and anxiety could be affecting his sleep and, in turn, could be a contributing factor with respect to his tremor.  (Tr. 307.)  Dr. Puente noted that McCoy responded well to Requip, and he prescribed another gradual medication increase.  (Tr. 307.)

In December 2004, McCoy completed a Supplemental Disability Report.  (Tr. 180-83.)  He reported his activities to be yard work, gardening, watching television, listening to music, and driving approximately three times weekly.  (Tr. 181.)  He stated that he was taking Requip for his hand tremors, but he was not taking any medication for PTSD.  (Tr. 182.)

In January 2005, McCoy saw a psychiatrist, Mohammad S. Kamal, M.D., for a consultative evaluation.  (Tr. 310-14.)  McCoy was alert, oriented, and showed no physical disorder or abnormal psychomotor activity.  (Tr. 310, 312.)  Dr. Kamal opined that McCoy had no restrictions in his daily living activities but had difficulties in social functioning.  (Tr. 312.)  Dr. Kamal stated that McCoy could concentrate and therefore complete tasks, understand and remember short simple instructions, carry our short simple instructions under ordinary supervision, and adapt to environmental changes.  Dr. Kamal noted, however, that McCoy might have a compromised ability to relate to coworkers and supervisors because of his anxiety, anger, and related feelings.  Dr. Kamal's diagnoses

9

included, in relevant part: a history of PTSD, chronic with delayed onset; and recently diagnosed Parkinsonian syndrome.  He rated McCoy's GAF as 65.  (Tr. 313.)

McCoy returned to Dr. Puente for a followup visit on January 17, 2005.  (Tr. 306.) Dr. Puente noted that the tremors had responded well to the Requip, but that McCoy had developed other symptoms including a "vibration" that affected his whole body causing him to feel exhausted and disturbing his sleep.  (Tr. 306.)  Upon examination, Dr. Puente observed a resting tremor, "fairly symmetric in the right and left upper extremities, but very little in cogwheel rigidity or bradykinesia[5]."  (Tr. 306.)  Dr. Puente opined that the new symptoms could be a side effect of the medication or related to PTSD.  Dr. Puente changed McCoy's medication from Requip to Mirapex.  (Tr. 306.)

Dr. Puente saw McCoy again on March 1,  2005, for a followup visit for treatment of his tremors and to address a new symptom of forgetfulness.  (Tr. 304-05.)  Upon examination, Dr. Puente noted that McCoy was alert and oriented and exhibited "some resting tremor that was also present with writing" as well as "a very small degree of cogwheel rigidity[6]."  (Tr. 304.)  He also noted that movement and gait were "essentially intact." (Tr. 304.)  Dr. Puente continued to prescribe Requip[7] for the tremors and referred

---

[5]Bradykinesia is a feature of Parkinson's disease and is characterized by "a decrease in spontaneity and movement."  *Stedman's Medical Dictionary* 232 (27th ed. 2000).

[6]Cogwheel rigidity is a type of [rigidity] seen in [Parkinson's disease] in which the muscles respond with cogwheel-like jerks to the use of constant force in bending the limb." *Stedman's Medical Dictionary* 1574 (27th ed. 2000).

[7]Dr. Puente's notes reflect that after a short period of time on Mirapex, McCoy experienced some side effects and a decision was made to return to using Requip to manage his tremors.  (Tr. 304.)

McCoy for neuropsychological testing and an EEG to evaluate his memory problems.  (Tr. 305.)

In March 2005, McCoy saw Dr. Saathoff for increased urinary frequency.  No mention was made of tremor or PTSD, and McCoy was not in acute distress.  (Tr. 314.)

Also in March 2005, McCoy saw Dr. Stone[8] on Dr. Puente's referral for a neuropsychological evaluation to determine McCoy's cognitive and memory functioning and clarify his diagnosis.  (Tr. 266-71.)  Dr. Stone's testing  did not reveal any significant memory or cognitive impairment.  Dr. Stone concluded that McCoy was "psychologically capable of performing basic daily living tasks and maintaining minimally adequate social contacts."  (Tr. 270.)  McCoy continues to be able to understand and remember short simple as well as complex complicated instructions.  He can often carry out complex complicated instructions under ordinary supervision.  Dr. Stone opined that McCoy is able to relate appropriately to coworkers and supervisors but noted that McCoy could have difficulty with the general public or in performing ongoing collaborative work with large numbers of coworkers or supervisors.   McCoy continued to be able to adapt to environmental changes.  ( Tr. 271.)

In late March 2005, McCoy saw Dr. Puente for a followup visit to assess the progress of the attempts to control his tremor.  (Tr. 301-02.)  Dr. Puente saw some resting tremor in the bilateral extremities that seemed to occur "intermittently in one hand, and at other times intermittently in the other," only mild cogwheeling, and "unremarkable" gait.  (Tr.

---

[8]Dr. Stone previously evaluated McCoy twice for Disability Determination Services. (Tr. 266.)

301.)  Dr. Puente increased McCoy's dosage of Requip.[9]  (Tr. 302.)  Dr. Puente's notes describe McCoy as "a gentleman with Parkinsonian tremor" who experiences "minor to moderate [memory and attention] deficits because of his tremor."  (Tr. 301-02.)  Dr. Puente also completed a mental Residual Functional Capacity ("RFC") Assessment form in which he noted some marked limitations in some areas relating to attention and concentration and stated that his tremors were a moderate limitation.  (Tr. 331-32.)

McCoy next saw Dr. Puente on February 22, 2006, for a followup visit, nearly a year after his last visit.  McCoy reported that his tremor was worse with stress.  Upon examination, Dr. Puente noted that McCoy exhibited "some resting tremor, slightly worse on the left than right," a slowed gait, and some cogwheeling in his left upper extremity.  (Tr. 810.)  Dr. Puente opined that "[h]is presentation and history mostly point to Parkinson's." (Tr. 810.)  He went on to opine that the disease was at "a pretty mild stage," "not affecting his activities of daily living to a significant degree," and described his prognosis as "pretty good" given the slow progression of symptoms.  (Tr. 810.)  Dr. Puente increased McCoy's dosage of Requip.  (Tr. 810.)

After McCoy's Title II insured status expired, in January 2007, McCoy saw Robert Arias, Ph.D., for a neuropsychological evaluation.  (Tr. 916-19.)  Testing revealed a moderate memory retrieval impairment but otherwise normal cognitive performance.  Dr. Arias noted that McCoy's impairment was consistent with that of individuals diagnosed with Parkinson's disease.  Dr. Arias assigned a GAF of 65 and stated that McCoy would "perform best at in [sic] a position in which he [is] able to learn a rote set of activities and

---

[9]Dr. Puente also recommended a psychiatric evaluation for depression.  (Tr. 302.)

complete them in a repetitive manner." (Tr. 916.)  Dr. Arias also recommended that McCoy avoid occupations that require work near dangerous machinery, and he suggested that McCoy should be allowed to work independently and at his own speed.   He also recommended vocational rehabilitation to identify a specific occupation within suggested limits.  Finally, Dr. Arias recommended continued psychiatric and psychotherapy treatment. (Tr. 916.)

### McCoy's Testimony

On January 17, 2007, McCoy testified at the administrative hearing before the ALJ. (Tr. 1276-98.)  McCoy testified that he obtained his GED while in the military.  (Tr. 1277.) He testified with respect to his three years of military service which included deployment to Vietnam and ended with a dishonorable discharge.  (Tr. 1277.)

McCoy testified that he and his third wife had been married nearly eleven years and have two children, who were then ages eight and ten.  (Tr. 1279.)  His two stepchildren, then ages fourteen and sixteen, also lived in the home.  (Tr. 1279.)  McCoy testified that his wife was unemployed but was receiving money from a family business and his in-laws pay most of the family's expenses.  (Tr. 1280.)

McCoy testified that he previously worked as a heavy general laborer for approximately six years beginning in 1987, in some temporary jobs testing water tanks as well as in other short-term or temporary jobs.  (Tr. 1280, 1282, 1284.)  He testified that his laborer and water testing jobs ended due to his absenteeism.  (Tr. 1281, 1285.)  In response to the ALJ's question as to why hadn't worked in the last five to seven years, McCoy replied, "I started having problems with my tremors . . . and they were getting worse

. . . then I was having trouble focusing. . . .  Whatever is going on with me seems to be progressing.  And it's getting worse."  (Tr. 1285.)

McCoy testified that he could not do "anything" at home  due to his inability to focus and his neuropathy (Tr. 1286)   He stated that he had trouble with stairs.  He was still driving.  (Tr. 1288.)  McCoy testified that on a typical day he gets up at 7:00 a.m. and helps get the children ready for school.  He then home schools one daughter.  (Tr. 1290.)  He helps with the children when they return home from school.  (Tr. 1291.)  McCoy stated that he was hypervigilant and had flashbacks to Vietnam and intrusive thoughts.  (Tr. 1292-93.) He testified about his pain in his feet due to neuropathy and stated that he sometimes, and then that he always, uses a cane.  His cane was broken and, therefore, he did not use it at the hearing.  (Tr. 1293-94.)  McCoy's daily activities include: taking out the garbage; yard work, including the clearing of vegetation; and pulling weeds from a sitting position.  McCoy stated that he could no longer mow his yard.  (Tr. 1295.)  McCoy stated that he could walk only about fifty feet and could not wear shoes.  (Tr. 1295-96.)

**Vocational Expert's Testimony**

The ALJ asked the vocational expert ("VE"), Michael McKeeman, about McCoy's ability to do unskilled work.  (Tr. 1303.)  The ALJ asked the VE to consider a hypothetical claimant of McCoy's age, education, and work experience, who had the capacity to do routine repetitive unskilled work with ordinary supervision and work that did not require him to set goals or deal with job changes.  In addition, the hypothetical claimant could handle only brief or superficial interaction with co-workers, the public and supervisors, but not frequent or constant interaction.  Finally, the claimant was also limited to occasional fine fingering due to a mild tremor, but had no limitations with respect to reaching and handling.

14

(Tr. 1303.)  The VE was unable to respond to the hypothetical with respect to past work due to the "sketchiness" of McCoy's description of his past relevant work.  (Tr. 1303.)

The ALJ proceeded to limit the proposed hypothetical to other unskilled work.  (Tr. 1304.)  The VE testified that such a claimant could perform light or medium work as a building cleaner (1,563 and 7,104 jobs in Nebraska, respectively), light work as a kitchen helper (2,895 jobs in Nebraska), and light or medium work as a miscellaneous laborer (415 and 3,459 jobs in Nebraska, respectively).[10]  (Tr. 1304-05.)  In summary, the VE opined that a "wide range of employment" options were available to McCoy.  (Tr. 1305.)  Finally, the VE testified that if McCoy's testimony is found to be credible he would not be able to  work at any occupation.  (Tr. 1306.)

**The ALJ's Decision**

After following the sequential evaluation process set out in 20 C.F.R. § 404.1520, the ALJ concluded that McCoy was not disabled during the relevant time period between the alleged onset date of September 15, 2000, and the date last insured, March 31, 2006. (Tr. 25.)  At step one, the ALJ found that McCoy last met the insured status requirements of the Social Security Act on March 31, 2006.  (Tr. 17.)   At step two, the ALJ found that McCoy did not engage in substantial gainful activity during the period from the alleged onset date of February 1, 2003, through his date last insured of March 31, 2006, noting that McCoy's most recent work was for a temporary employment service in March 2001.  (Tr. 17.)  At step three, the ALJ found that McCoy had the following medically determinable "severe" impairments through the date last insured of March 31, 2006: Parkinson's disease;

---

[10]The VE also testified that McCoy could perform sedentary labor work, but he did not provide the numbers in the national or regional economy for those jobs.  (Tr. 1304.)

PTSD; and a personality disorder.  (Tr. 17.)  At step four, the ALJ found that through the date last insured, McCoy's mental impairments, either singly or collectively, did not meet or medically equal the criteria of listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), or 12.08 (Personality Disorders).  (Tr. 19.)  At step five, the ALJ determined that, despite McCoy's medically determinable impairments, he possessed the RFC "to perform routine and repetitive work with an SVP of 1 or 2 under ordinary supervision so long as it did not require him to set goals or deal with job changes."  (Tr. 20.)  The ALJ further determined that McCoy was "able to tolerate only brief and superficial interaction with coworkers, the general public, and supervisors . . . [and] is able to do fine fingering only occasionally."  (Tr. 20.)

The ALJ also concluded: through the date last insured, McCoy could not perform any of his past relevant work; his past relevant work was unskilled; and through the date last insured, considering McCoy's "age, education, work experience, and residual functional capacity," jobs existed in significant numbers in the national economy that he could have performed.

## DISCUSSION

McCoy alleges that the ALJ erred in: 1) finding that his Parkinson's disease did not satisfy the requirement under listing 11.06; 2) determining his RFC; 3) relying on the VE's testimony in finding that he could perform other work; and 4) finding that he was not disabled under the Medical-Vocational Guidelines (the "Grids").

### I.    *Standard of Review*

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*.  Rather, the district court's

16

role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue,* 499 F.3d 835, 839 (8th Cir. 2007).

"'Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support" a decision.'" *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Eichelberger v. Barnhart,* 390 F.3d 584, 589 (8th Cir. 2004) (quoting *Krogmeier v. Barnhart,* 294 F.3d 1019, 1022 (8th Cir. 2002))).   The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue,* 604 F.3d 589, 592 (8th Cir. 2010).   As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Frederickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004).

An ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by Social Security regulations. *See* 20 C.F.R. § 404.1520(a).   The ALJ must determine:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Apfel,* 160 F.3d 1203, 1206 (8th Cir. 1998).

17

## II.    *Listing 11.06*

The ALJ considered McCoy's mental impairments in light of Listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and 12.08 (Personality Disorders) and concluded that McCoy did not have an impairment or combination of impairments that met those Listings.   The ALJ reasoned that McCoy lacked the necessary criteria: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (Tr. 19.)  The ALJ explained that McCoy had only: mild restrictions in his activities of daily living and social functioning; no more than moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation.

In conjunction with her RFC analysis, the ALJ stated the following regarding McCoy's failure to meet Listing 11.06 (Parkinsonian Syndrome):

> When DDS evaluated this case, it was felt claimant's physical condition was "non severe" i.e. no physical restrictions.  The listing for Parkinson's disease is found at 11.06 and requires significant rigidity or tremor in two extremities which results in sustained disturbance in movement or gait.  There is simply no evidence along these lines.  The claimant has "mild" tremor in one hand and furthermore, the neurologist is hesitant with the diagnosis, the condition is "Parkinson-like symptoms" with "minor to moderate deficits because of his tremor."  In fact the neurologist says the symptoms are mental.  The checklist prepared by the neurologist indicates marked difficulties in the detailed tasks, but only moderate limitations in simple work.  The doctor wrote that the limitations are "intermittent."

(Tr. 23 (referring to 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.06) (citation omitted).)

While medical records do refer to mild intermittent tremors in the bilateral upper extremities, the Court otherwise concurs with the ALJ's findings.  Medical records, including those of McCoy's treating physicians, do not support a finding that McCoy meets Listing

18

11.06.   Often, McCoy saw both treating and consultative doctors and his treating psychologist without mentioning hand tremors or related limitations.  McCoy stated more than once that his activities included gardening and mowing for up to an hour, driving, playing checkers, and surfing the Internet.  Despite the slight tremors McCoy experienced, he maintained full strength in his arms and his gait was normal.  Overall, his Parkinson's disease[11] was at an early mild stage during the relevant time period.  For these reasons, the Court agrees with the ALJ that McCoy does not meet the criteria necessary for the application of Listing 11.06.

## III.    RFC

McCoy argues that, in determining his RFC, the ALJ failed to: account for Dr. Stone's opinion that McCoy would have a difficult time in settings requiring contacts with the general public or larger numbers of coworkers and supervisors; account for McCoy's credible pain symptoms and limitations in reaching, handling, and stooping; and accept Dr. Puente's opinion of marked mental limitations and McCoy's own reports of problems with concentration due to intrusive thoughts.

### A.    Dr. Stone's Opinion

The ALJ appropriately accounted for Dr. Stone's opinion when she stated her finding that McCoy was "able to tolerate only brief and superficial interaction with coworkers, the general public, and supervisors."  (Tr. 20.)

### B.    McCoy's Subjective Pain Symptoms and Physical Limitations

---

[11]The neurologist's actual diagnosis was "likely Parkinson's disease."

19

In assessing a claimant's credibility, an ALJ must review all evidence relating to the subjective complaints, the claimant's work record, third party observations, and reports of both treating and consultative physicians. *Dipple v. Astrue,* 601 F.3d 833, 836 (8th Cir. 2010) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984) and 20 C.F.R. § 404.1529(c)(3)). "The ALJ should consider the claimant's daily routine; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions." *Id.* (citing *Polaski,* 739 F.2d at 1322).

In McCoy's case, the ALJ exhaustively considered all of the required factors. (Tr. 21-24.) The ALJ summarized McCoy's subjective complaints of pain. (Tr. 21, 22.) She then described many of his daily activities. (Tr. 21, 22.) The ALJ noted some of the inconsistencies that refute McCoy's allegations that he was unable to do anything physical. For example, the ALJ mentioned: gardening and McCoy's expansion of his garden by fourteen feet during his period of alleged disability; McCoy's stitching Christmas gifts; and beading work and McCoy's hope to sell beaded work. (Tr. 22-23.) McCoy had not worked since 2001, before his alleged onset date, and therefore the ALJ was unable to evaluate any pertinent work activity. The ALJ considered the reports and opinions of both treating and consultative physicians. (Tr. 22-24.) The ALJ's analysis considered: the duration, frequency, and intensity of McCoy's pain; precipitating and aggravating factors; and the dosage, effectiveness, and side effects of medication. (Tr. 22-24.) The ALJ also discussed McCoy's functional restrictions, noting that he did not accurately report them at the hearing. (Tr. 22-23.) In summary, the ALJ reviewed all of the required factors. The Court agrees with

her analysis and conclusion that McCoy's statements regarding his pain and the effects of his pain are not "entirely credible."[12]

## C.   Dr. Puente's Opinion and McCoy's Statements Regarding Mental Limitations

An ALJ may reject a physician's opinion or subjective complaints of disabling limitations if the report or complaints are inconsistent with the record as a whole.  *Farstad v. Astrue,* 342 Fed. Appx. 221, 222-23 (8th Cir. 2008).

The ALJ noted that Dr. Puente's opinion set out in a mental RFC assessment finding marked limitations in the areas of understanding and memory as well as concentration and persistence was formed before he had the benefit of Dr. Stone's comprehensive report relating to McCoy''s cognitive and memory functioning.  The Court also notes the striking inconsistencies between the opinions reflected in the RFC assessment and Dr. Puente's own examination notes from his treatment of McCoy.  Dr. Puente's examination notes do not reflect significant pain, limitations, or progression of Parkinson's.  It appears that Dr. Puente based his opinions in the RFC assessment form on McCoy's subjective complaints.

Turning to McCoy's subjective complaints, they are not supported by the record as a whole.  McCoy's own statements are inconsistent, for example, with respect to such matters as his daily activities, use of a cane, ability to wear shoes, and ability to walk or sit.  McCoy's complaints are also inconsistent with credible medical evidence.  Dr. Puente's opinion reflected in the RFC assessment was discussed above.  In reviewing the opinions of McCoy's therapist, Dr. Lingren, the Court notes that her statements are inconsistent, unsupported by details reflecting McCoy's inability to engage in certain activities, and based

---

[12]McCoy's diagnosis of mixed personality disorder with antisocial features may also lead a reasonable finder of fact to question his credibility.

primarily on McCoy's subjective complaints that this Court finds largely not credible.  For these reasons, the Court rejects this argument.

**IV.    Vocational Expert**

McCoy argues that the hypothetical posed to the VE was improper because the evidence does not support his ability to reach and handle.  McCoy's argument is misplaced, as the medical evidence shows that any hand tremors did not affect his ability to reach or handle.  Because the ALJ did not find such limitations, the hypothetical was proper.  *Robson v. Astrue,* 526 F.3d 389, 393 (8th Cir. 2008).

**V.    Grids**

McCoy argues that the ALJ should have applied the medical-vocational guidelines contained in 20 C.F.R. pt. 404, subpt. P, app. 2 ("grids").  In this case, however, because McCoy could not perform all or substantially all of the requirements of a medium level of work, it was appropriate for the ALJ to elicit testimony from a VE whether jobs exist in the national economy for an individual with McCoy's precise limitations.  *Fenton v. Apfel,* 149 F.3d 907, 911 (8th Cir. 1998).

CONCLUSION

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the decision of the Commissioner, and will enter judgment accordingly.

IT IS ORDERED:

1.     The decision of the Commissioner is affirmed and the appeal is denied; and

4:09-cv-03155-LSC   Doc # 28   Filed: 09/03/10   Page 23 of 23 - Page ID # 146

4:09-cv-03155-LSC   Doc # 28   Filed: 09/03/10   Page 23 of 23 - Page ID # 146

2.      A separate Judgment will be entered in this case consistent with this

Memorandum and Order.

DATED this 3rd day of September, 2010.

                                                BY THE COURT:

                                                S/Laurie Smith Camp
                                                United States District Judge

23

2.      A separate Judgment will be entered in this case consistent with this

Memorandum and Order.

DATED this 3rd day of September, 2010.

BY THE COURT:

S/Laurie Smith Camp
United States District Judge